UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

    ERIC BRUNDEGE                           CASE NO.  05-65053

                     Debtor
--------------------------------------------------------
JILL R. BRUNDEGE

                   Plaintiff

              vs.                             ADV. PRO. NO. 05-80213

ERIC BRUNDEGE

                  Defendant
--------------------------------------------------------
APPEARANCES:

JILL R. BRUNDEGE
29 Victoria Drive
Binghamton, New York 13904

PETER A. ORVILLE, ESQ.
Attorney for Defendant
30 Riverside Drive
Binghamton, New York 13905


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge


**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**


Under consideration by the Court is the complaint filed by Jill R. Brundege ("Plaintiff")

on a pro se basis on September 13, 2005.  The Court interpreted the complaint as seeking relief

pursuant to § 523(a)(5), § 523(a)(15) and § 727(a)(2) and (4) of the U.S. Bankruptcy Code, 11

U.S.C. § 101-1330 ("Code"). An answer to the complaint was originally filed on November 26, 2005, by Eric Brundege (the "Debtor"). On December 23, 2005, the Debtor filed a motion for summary judgment, which was denied by Order of the Court on March 6, 2006. The Order of March 6th required that the Plaintiff file and serve an amended complaint "with factual details to support the allegations in her Complaint within 20 days . . . ." (Adv. Pro. Docket No. 20). The Plaintiff subsequently filed an amended complaint on March 15, 2006 ("Amended Complaint"). On March 24, 2006, the Debtor filed his answer to the Plaintiff's Amended Complaint.

A trial was held on June 8, 2006, in Utica, New York. At the close of the Plaintiff's case, the Debtor requested that the complaint be dismissed on the basis that the Plaintiff had failed to meet her burden of proof. The Court reserved on the Debtor's motion and allowed the Debtor to present proof in support of his answer. At the close of the Debtor's proof and in lieu of closing arguments, the Court afforded the parties an opportunity to file memoranda of law. The matter was submitted for decision on July 7, 2006.

**JURISDICTIONAL STATEMENT**

The Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), and (b)(2)(I) and (J).

**FACTS**

The Debtor filed a voluntary petition pursuant to chapter 7 of the Code on June 21, 2005.

According to the testimony of the Plaintiff, at the time of the trial she and the Debtor had been married for eleven years. Their son, Jordan, was seven years old. Plaintiff testified that she moved out of the marital residence, located at 29 Victoria Drive, Binghamton, New York (the "Premises"), on November 12, 2004. Subsequently, the Plaintiff commenced an action in New York State Supreme Court, Broome County ("State Court"), seeking a divorce from the Debtor. At the time of trial, the action was still pending and no determination of equitable distribution or alimony had been made and no judgment of divorce entered.[1] However, according to the Plaintiff, an order for child support was entered by the State Court on June 10, 2005.

Debtor did not list the Plaintiff as a creditor in his schedules. He did list her as a codebtor on what he identified in Schedule D as secured debts allegedly owed to National City Mortgage and Visions Federal Credit Union ("Visions"). *See* Schedule H. According to the Debtor's schedules, a debt was owed to Chase Bank on a credit card account which he estimated to total approximately $9,000 at the time he filed his petition. *See* Schedule F. Debtor did not list the Plaintiff as a codebtor on that credit card debt. However, according to the Plaintiff's testimony, she had been paying on a credit card account with Chase Bank because it was in both of their names.

The Plaintiff also testified that she had been paying on a home equity line of credit with Visions in the principal amount of approximately $30,000. According to the Plaintiff, she had signed the application for the line of credit in July 2002 but had not realized that the Debtor had

---

[1] The Debtor's original Statement of Financial Affairs made no reference to the action in State Court. However, Debtor's Amended Statement of Financial Affairs, filed on June 8, 2006, the same day as the trial, identified the action as pending. *See* Amended Statement of Financial Affairs at ¶ 4.

4

borrowed approximately $30,000 on it until the two separated and she was contacted by Visions. She testified that she had been paying on that debt in order to prevent foreclosure of the Premises. There was also testimony that the Debtor had transferred title to the Premises to the Plaintiff in August 2005 with the consent of the chapter 7 trustee.[2]

Although not listed in the Debtor's original Statement of Financial Affairs, according to the Amended Statement of Financial Affairs, the Debtor transferred $59,889.77 to National City Mortgage in March 2005. *See* Amended Statement of Financial Affairs at ¶ 3A. It was the Debtor's testimony that the payment was in the form of insurance proceeds paid following a fire at the Premises in December 2004. Also not listed in the original Statement of Financial Affairs is a payment to Plaintiff on March 27, 2005, in the amount of $5,605, written on the checking account of the Debtor's mother, Georgia Brundege. *Id.* at ¶¶ 3B and 10. The Debtor explained that he had received a check from State Farm Fire and Casualty Company ("State Farm"), dated December 26, 2004, payable to him and the Plaintiff in the amount of $11,209.99. *See* Plaintiff's Exhibit G. Because his checking account with Visions was frozen at the time, he testified that he had endorsed the check by signing both his and the Plaintiff's name and depositing it into his mother's account. In turn, on or about December 27, 2004, his mother wrote a check payable to the Plaintiff for half of the amount of the original check or $5,605.

Also omitted from the Debtor's original Statement of Financial Affairs was any mention of the loss incurred in connection with the fire at the Premises in December 2004. It was,

---

[2] According to the Debtor's schedules, the value of the Premises was approximately $85,000. The Debtor's schedules identify National City Mortgage as holding a first mortgage on the Premises with a balance due of $50,553, and Visions as holding a second mortgage with a balance of $30,200.

5

however, listed in his Amended Statement of Financial Affairs. *Id.* at ¶ 8. The Debtor explained that because he had received payment from State Farm under an insurance policy on the Premises, he did not consider it a loss.

In her complaint, the Plaintiff raised an issue concerning a 1995 Buick LeSabre that the Debtor was driving at the time he filed his petition. The vehicle was listed in Schedule B with a value of $1,400. *See* Schedule B. It was also claimed by the Debtor as exempt. *See* Schedule C. The Debtor testified that in June 2005, the same month in which he filed his bankruptcy petition, he had transferred his 1999 Chevrolet Blazer to his aunt in exchange for the Buick. His aunt, in turn, had received a credit of $1,700 in trade on a new car. The transfer of the Blazer was not listed in the original Statement of Financial Affairs but was identified in the Amended Statement of Financial Affairs at ¶ 10. According to the Debtor, he made the exchange with his aunt because the Blazer was in need of extensive repairs, and he needed reliable transportation to travel to and from his work.

Debtor also failed to list a hockey card collection in his original Statement of Financial Affairs. In his Amended Statement of Financial Affairs, he lists the collection as being held by him in the basement of his mother's house in Endwell, New York, where he was residing. According to the Debtor, he had not listed the collection as personal property in his original schedules because he considered it to belong to his son, Jordan.

At the trial, the Plaintiff raised questions concerning the value of the collection, which Debtor had listed as having "unknown value." She testified that after the fire she had contacted the Debtor to inform him that a representative of ServPro, the cleaning service hired after the fire, had placed the collection with other boxes that were to be thrown out. According to the Plaintiff,

6

the Debtor told her that the collection was worth more than the Premises, and that he did not want the hockey cards thrown out.

Plaintiff also questioned the Debtor concerning what she perceived to be discrepancies between the expenses listed in Schedule J, filed with the Debtor's Petition on June 21, 20005, and the Statement of Net Worth, dated June 7, 2005, which was prepared in connection with the State Court action (*see* Plaintiff's Exhibit H). For instance, according to Schedule J, the Debtor listed $600 in rent, while the Statement of Net Worth lists rent as "0." The Debtor testified that he was living with his mother and that he pays her $600 per month for room and board. At the same time, he listed $350 for food each month in Schedule J, as compared with $150 per month listed in the Statement of Net Worth. Also listed in Schedule J was an expense of $100 per month to the Internal Revenue Service ("IRS"), which was identified as "0" in the Statement of Net Worth. The Plaintiff also questioned the Debtor's listing of a monthly payment of $150 in child support, which she indicated he had not been paying at the time he filed his petition.

The Debtor testified that he prepared the Statement of Net Worth on his own without the assistance of an attorney. Schedule J was prepared with the assistance of his bankruptcy attorney. He testified that at the time he signed his Petition on June 17, 2005, he had not received the order from the State Court requiring that he make child support payments.[3] It was his testimony that the $150 listed on Schedule J was only an estimate. The State Court order actually required that he make payments of $200 on a biweekly basis and that approximately $650 per month was being garnished from his wages. With respect to the payments to the IRS, he testified that the $100 per

---

[3] As noted previously, according to the Plaintiff the State Court allegedly entered an order for child support on June 10, 2005.

month figure was also an estimate. At the time of trial, he was actually paying the IRS $205 per month by way of a wage garnishment and that was to increase to $325 per month.

Finally, in her Amended Complaint, the Plaintiff raised questions concerning the value placed on household furnishings by the Debtor in Schedule B of $1,500. According to the Plaintiff, the Debtor has household furnishings with a value of more than $1,500 that belong to both of them. She testified that since the fire she has been denied access to the household furnishings, which originally had been placed in storage with ServPro and later removed from storage to where the Debtor was residing. The Debtor testified that until the divorce action was resolved, it was his understanding that neither he nor the Plaintiff were entitled to any of the furniture. Accordingly, he had placed a value of $1,500 on the items currently in his possession which he considered to be his property. He testified that the estimated value of $1,500 did not include most of the personal property that had been held in storage by ServPro following the fire.

## DISCUSSION

Plaintiff's Standing

As an initial matter, this Court has a duty to determine whether Plaintiff has standing to seek to have the Debtor's discharge denied pursuant to Code § 727(a)[4] despite the fact that the

---

[4] At the trial, the Court expressed the view that the only viable cause of action was Code § 727(a). The parties acknowledged that an award of child support was not made until June 2005. The Debtor does not dispute that any debt for child support would not be dischargeable pursuant to Code § 523(a)(5). The Court also indicated that it was dismissing the cause of action based on Code § 523(a)(15) because at the time the petition was filed, there had been no final

8

Debtor has not raised the issue. *See In re Miner*, 229 B.R. 561, 565 (2d Cir. BAP 1999) (citations omitted). In this regard, the Court notes that "[s]tanding is a jurisdictional requirement which is open to review at all stages of the litigation." *In re Cross*, 203 B.R. 456, 457 (C.D.Cal. 1996), *rev'd on other grounds,* 218 B.R. 76 (9th Cir. BAP 1998).

Pursuant to Code § 727(c)(1), the trustee, a *creditor* or the U.S. Trustee may object to the granting of a discharge under Code § 727(a). *See* 11 U.S.C. § 727(c)(1). Code § 101(10)(A) defines "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5)(A).

As was noted previously, the Debtor did not list the Plaintiff as a creditor in his schedules. In addition, at the time of filing, there had been no determination by the State Court concerning equitable distribution. The issue before the Court is whether the Plaintiff, at the time of the commencement of the case, had a claim, making her a creditor with standing to object to the Debtor's discharge. This issue of whether a claim of a nondebtor spouse is considered to be prepetition or postpetition in the context of divorce proceedings pending at the time the bankruptcy case was commenced has been addressed by a number of courts. *See, e.g., In re Howell*, 311 B.R. 173 (Bankr. D.N.J. 2004); *In re Schorr*, 299 B.R. 97 (Bankr. W.D. Pa. 2003); *In re Miller*, 268 B.R. 826 (Bankr. N.D. Ind. 2001); *In re Brugger*, 254 B.R. 321 (Bankr. M.D.

---

determination concerning equitable distribution in connection with the pending divorce action. This latter issue will be addressed further in the body of this Decision.

Pa. 2000; *In re Berlingeri*, 246 B.R. 196 (Bankr. D.N.J. 2000); and *In re Scholl*, 234 B.R. 636 (Bankr. E.D. Pa. 1999). With the exception of *Schorr,* the courts have concluded that such claims arise postpetition and, therefore, are not dischargeable in the debtor's bankruptcy case. As the court in *Brugger* explained, "[t]he issue of timing is very important when determining property interests. Upon filing for divorce, the parties hold an inchoate right to the equitable distribution of marital property. *Brugger*, 254 B.R. at 324. It found that only after there has been an order of equitable distribution of property that a debt or claim arises. *Id.; see also Berlingeri*, 246 B.R. at 201 (noting that "only the entry of an agreement of the parties or an equitable distribution order can create enforceable rights as against a spouse, and thus potentially give rise to a 'right to payment'") (citing to *Scholl*, 234 B.R. at 642-43).

In a recent decision, the court in *In re DiGeronimo*, Case No. 800-80214-511, Adv. Pro. 801-8379-511, 2006 WL 3353780 (Bankr. E.D.N.Y. Nov. 9, 2006) acknowledged the line of cases which hold that a divorce judgment entered postpetition creates a postpetition debt that is not subject to discharge in the debtor's case. *Id.* at *8. However, the *DiGeronimo* court also took note of cases that applied New York law and ultimately concluded that "where a divorce action is commenced pre-petition, but the divorce judgment is not entered until after the petition is filed, a debtor's ex-spouse holds but an unsecured claim against the estate." *Id.* at *9, citing to *In re Anjum*, 288 B.R. 72, 76 (Bankr. S.D.N.Y. 2003) and *In re Cole*, 202 B.R. 356, 360 (Bankr. S.D.N.Y. 1996). U.S. Bankruptcy Judge Melanie L. Cyganowski in *DiGeronimo* found further support for her conclusion based on the decision of the U.S. Court of Appeals for the Second Circuit in *In re Ostashko*, 468 F.3d 99 (2d Cir. 2006), issued three days prior to her own decision in *DiGeronimo*. *DiGeronimo,* 2006 WL 3353780, slip op. at *9, n.14.

10

The court in *Otashko* cited to *Anjum* for the proposition that "when a final judgment of divorce has not been entered at the time of the bankruptcy filing, the non-debtor spouse's rights may be no greater than that of a general unsecured creditor" and to *Cole* for the proposition that "[i]f bankruptcy intervenes before the state court enters the [divorce] judgment, the trustee's status as hypothetical lien creditor cuts off the non-debtor spouse's inchoate rights in marital property, and leaves her with a general unsecured claim." *Id.* at 107-108. It concluded that

> [t]o the extent that the state court ultimately establishes an equitable distribution award in favor of a non-debtor spouse after the debtor spouse has filed for bankruptcy, that award transforms the non-debtor spouse into a creditor of the bankruptcy estate within the meaning of 11 U.S.C. § 101(10).

*Id.* at 108, citing *In re Palmer*, 78 B.R. 402, 406 (Bankr. E.D.N.Y. 1987).

This Court is bound by *Otashko* and, accordingly, concludes that the Plaintiff's inchoate right to marital property places her in a position of holding what might be construed as an unsecured contingent claim in the Debtor's bankruptcy case. In addition, as a cosignor of the credit obligations on both the credit card account and the home equity line of credit, the Court finds that the Plaintiff holds at least contingent claims against the debtor. *See In re Brown,* 37 B.R. 295, 298 (Bankr. W.D. Ky. 1983). Therefore, the Court concludes that she has standing to assert a cause of action pursuant to Code § 727(a).

Code § 727(a)(2) and (a)(4)

The question before the Court is whether or not the Plaintiff has met her burden of

establishing a basis on which to deny the Debtor a discharge pursuant to Code § 727(a) and Rule 4005 of the Federal Rules of Bankruptcy Procedure. In this regard, the Court recognizes that a denial of a debtor's discharge is among the harshest sanctions that may be imposed against a debtor because it denies a debtor the fresh start that is so central to the purpose of the bankruptcy laws. *See In re Kokoszka*, 479 F.2d 990, 997-98 (2d Cir. 1973), *aff'd,* 417 U.S. 642 (1974); *Skaneateles v. Scott (In re Scott)*, 233 B.R. 32, 45 (Bankr. N.D.N.Y. 1998). The court in *Kokoszka* noted that

> [t]he denial of a discharge can work a serious deprivation upon a debtor, and there are many circumstances where a bankrupt's disobedience may have been inadvertent or otherwise excusable. * * * Therefore, . . . [the court] should weigh the detriment to the proceedings and the dignity of the court against the potential harm to the debtor if the discharge is denied. [It] should consider such factors as the intent behind the bankrupt's acts - were they wilful or was there a justifiable excuse; was there injury to the creditors; and is there some way that the bankrupt could make amends for his conduct.

*Id.* at 997-98.

Code § 727(a)(2)(A) requires the Plaintiff to establish that 1) the debtor transferred, removed, destroyed, mutilated, or concealed (2) his or her property (or the property of the estate if the transfer occurs post-petition) (3) within one year of the petition filing date (for prepetition transfers) (4) with intent to hinder, delay or defraud a creditor. *In re Watman*, 458 F.3d 26, 32 (1st Cir. 2006).

In this case, the Plaintiff has raised concerns about a number of items that were initially omitted from the Debtor's original Statement of Financial Affairs, which he subsequently amended on the day of the trial in response to the Plaintiff's allegations in her Amended Complaint. For instance, the Plaintiff questioned the fact that the Debtor had transferred his

12

vehicle the same month that he filed his petition.

With respect to the Plaintiff's burden, she established the first three elements noted above. The Debtor transferred his 1999 Blazer to his aunt within the year prepetition. With respect to whether the Debtor made the transfer with the intent to hinder or defraud his creditors, it is evident that the Plaintiff believed that the Debtor traded vehicles with his aunt in order to be able to claim the vehicle as exempt within the limit of $2,400 set forth in New York Debtor and Creditor Law § 282(1). However, the Debtor offered what the Court believes to be a reasonable explanation that the trade occurred in order to provide him with a reliable means of transportation and not with any intent to defraud his creditors.

Another transfer not listed in the Debtor's original Statement of Financial Affairs was the endorsement of the check from State Farm, made payable to the Plaintiff and the Debtor, to his mother, Georgia Brundege, and the deposit of the monies into her account. Again, the Plaintiff has failed to establish that there was any intent to hinder or defraud any of Debtor's creditors. Indeed, the ultimate transfer of half of the proceeds was to the Plaintiff herself. While she raised questions with the Debtor concerning how he had decided that she was only entitled to half of the proceeds, that is perhaps a question more appropriately raised in the context of the State Court action.

With respect to Code § 727(a)(4), the Plaintiff must establish by a preponderance of the evidence that "(1) the debtor made a statement under oath, (2) such statement was false, (3) the debtor knew the statement was false, (4) the debtor made the statement with fraudulent intent, and (5) the statement related materially to the bankruptcy case." *In re Abramov*, 329 B.R. 125, 132 (Bankr. E.D.N.Y. 2005). In this regard, a false oath may consist of a false statement or omission

13

in the debtor's schedules. *Id.* The Plaintiff must show that the omitted information in the Debtor's schedules occurred not because of the Debtor's carelessness or misunderstanding but because the Debtor exhibited a reckless indifference for the truth in completing the schedules or intended to mislead his creditors. Once the Plaintiff has established that the Debtor knowingly made a false statement under oath with a fraudulent intent and that the misstatement materially relates to the case, it is the Debtor's burden to offer a credible explanation for the statement. *Id.* at 133.

In this case, the primary instances of false statements, as alleged by the Plaintiff, concern the hockey card collection, which Debtor failed to list in his original Statement of Financial Affairs, and the discrepancies concerning his expenses, as set forth in Schedule J and the Statement of Net Worth. Plaintiff also questions the value of the household furnishings which Debtor listed as being $1,500 and which the Plaintiff contends should be higher.

Clearly, the hockey card collection was not listed on the Debtor's schedules. In his Amended Statement of Financial Affairs, he identified the collection as being in his possession. He testified that he did not consider himself the owner of the cards. In fact, the collection is still not listed as an item of personal property belonging to the Debtor. Instead, he has included it in his Amended Statement of Financial Affairs as being property in his possession that is being held for another, namely, his son, Jordan. Plaintiff attempted to demonstrate to the Court the size of the collection, both through her testimony and that of her sister, Lisa Dutcher, who had visited the house shortly after the fire had occurred and had seen the boxes of cards in the basement. Plaintiff, however, did not offer any proof concerning the value of the card collection, other than testifying that the Debtor had once stated, in response to being told by the Plaintiff that a

representative of ServPro intended to throw the cards out after the fire, that their value exceeded the value of the whole house.

The Court finds the Debtor's explanation reasonable. It appears his failure to list the collection in his schedules as personal property was not intended to defraud his creditors. Based on the evidence presented, it is also difficult to conclude that the Debtor's failure to list the collection somehow materially affected his case.

With respect to the discrepancies noted on Schedule J, as compared to the Debtor's Statement of Net Worth, the Court cannot conclude that the statements were knowingly false. While he was unable to present proof that he had been paying his mother rent of $600 per month since moving out of the Premises and obtaining a job, the Plaintiff herself indicated that $600 per month is a reasonable rate of rent in the Endwell, New York area where the Debtor was residing. It appears that she was simply questioning whether he was actually paying rent to his mother, given the fact that he could have rented his own apartment in Endwell, New York, for the same amount.

Plaintiff presented no evidence to suggest that the Debtor falsified his income as listed on Schedule I, or that there was any disposable income available to pay creditors after payment of the various expenses identified in Schedule J. According to the Debtor, it was on the advice of counsel that he included the expenses for child support and taxes and/or penalties owed to the IRS on Schedule J even though he was not making such payments at the time he filed. In fact, there was testimony that indicated that the estimates of those expenses were substantially less than the Debtor's actual expenses postpetition for which his wages were being garnished.

Finally, with respect to the household furnishings, the Debtor presented a reasonable

explanation for his having listed a value of $1,500.  According to the Debtor, he understood that the distribution of marital property was a matter for the State Court to decide and that until such a determination had been made, neither he nor the Plaintiff were entitled to the items.  Under those circumstances, the Court cannot conclude that the valuation, as listed by the Debtor, was knowingly fraudulent and intended to defraud his creditors or that it would have, in any way, materially impacted on the Debtor's case.

Therefore, viewing the evidence liberally in the Debtor's favor as it must (*see Abramov*, 329 B.R. at 130), the Court concludes that the Plaintiff has not met her burden by a preponderance of the evidence of establishing a basis for the denial of the Debtor's discharge pursuant to Code § 727(a)(2) and (4).

Code § 523(a)(15)

In *Miller* the state court had not made a decision on the division of marital assets or apportionment of marital debts when the debtor filed his petition.  The nondebtor spouse commenced an adversary proceeding pursuant to Code § 523(a)(15) seeking a determination that any obligation imposed by the state court against the debtor be was nondischargeable. *Miller*, 268 B.R. at 827.  The court in *Miller* discussed the advantages using the date of the state court's ultimate decree as the operative date for any debt to have arisen. *Id.* at 831.  The court pointed out that the time for filing a complaint objecting to the dischargeability of a debt pursuant to Code § 523(c), which expressly references § 523(a)(15), is limited to the 60 day period measured from the first date set for the meeting of creditors under Code § 341.[5]  *Id.*  It noted that "it is impossible

---

[5] Reference to Code § 523(a)(15) in Code § 523(c) was deleted from the section pursuant to The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which was signed into law on April 20, 2005, and made applicable to cases filed after October 16, 2005.

for either the debtor or its former spouse to carry the burden of proof imposed upon it by § 523(a)(15)" until the order is entered by the state court and there is no longer any uncertainty regarding whether or not an obligation will be imposed upon the debtor. *Id.* at 831-32. Thus, the court in *Miller* concluded that it was appropriate to dismiss the adversary proceeding based on a finding that "a rule that no debt – contingent or otherwise - exists until the state court has actually entered its order or decree promotes judicial administration, by eliminating the filing of cases that cannot go forward, and helps to ensure more accurate decisions." *Id.* at 832.

This Court finds some merit to the analysis of the court in *Miller.* Nevertheless, because this Court is bound by the Second Circuit's decision in *Otashko,* it must conclude that the debt, although not yet determined by the State Court, arose prepetition when the divorce action was commenced. This same approach was taken by the court in *Schorr*, 299 B.R. at 97.

In that case, the court found that the nondebtor's prepetition request for equitable distribution constituted a "claim" against the debtor's chapter 7 estate that arose prepetition. *Id.* at 103. The court found that the alleged debt was incurred by the debtor when he commenced the divorce action and the nondebtor spouse responded by counterclaiming for equitable distribution of the marital property. *Id.* at 105. The court in *Schorr* disagreed with the finding in *Scholl* that a court order of equitable distribution was a prerequisite to a nondebtor spouse having a "claim" against the debtor spouse. *Id.* at 102. The court further explained that

> [o]nce the equitable distribution issue is resolved in the divorce proceeding, the non-debtor spouse could then request re-opening of debtor's bankruptcy case pursuant to § 350(b) of the Bankruptcy Code. At that point it would be possible for the bankruptcy court to apply § 523(a)(15)(A) and (B) to the facts and to

---

Because the case herein was commenced on June 21, 2005, BAPCPA is not relevant to this discussion

finally determine whether or not the debt is discharged"). . . . * * * To the extent that it would put the bankruptcy court in the "anomalous position" of applying the balancing test found at § 523(a)(15) right after the state court (or the bankruptcy court itself) has adjudicated the request for equitable distribution, so be it!).

*Schorr*, 299 B.R. at 106. However, because the nondebtor spouse in that case had failed to timely commence an adversary proceeding pursuant to Code § 523(a)(15), any obligation that might arise in the divorce action in state court had been discharged in the bankruptcy case. *Id.* At 107. Accordingly, the court in *Schorr* held that she was prohibited from pursuing equitable distribution in the state court. *Id.*

Unlike the situation in *Schorr*, the Plaintiff timely commenced an adversary proceeding in which she asserted a cause of action based on Code § 523(a)(15). At the trial, the Court suggested that the Plaintiff consider having her divorce attorney seek relief from the automatic stay in order to proceed with the State Court action. Because the Debtor's cause of action pursuant to Code § 523(a)(15) was timely made within the parameters set forth in Code § 523(c), the Court will dismiss her Amended Complaint without prejudice and will allow the Plaintiff to file another pursuant to Code § 523(a)(15) within 30 days of the issuance of a Judgment of Divorce by the State Court, to the extent that it includes a provision for equitable distribution.[6]

Based on the foregoing, it is hereby

ORDERED that the Debtor's motion at trial seeking dismissal of the Plaintiff's Amended Complaint is granted to the extent that it seeks a denial of the Debtor's discharge pursuant to

---

[6] In the event that the case is closed before any such judgment by the State Court is entered, it will be necessary for the Plaintiff seek to reopen the case pursuant to Code § 350(b), as pointed out by the court in *Schorr*. *Id.* at 106 (indicating that "[s]uch a procedure would comport with the requirement that chapter 7 estates be closed 'as expeditiously as possible as is compatible with the best interest of parties." 11 U.S.C. § 704(1)").

Code § 727(a)(2) and § 727(a)(4); it is further

ORDERED that the relief sought in the Plaintiff's Amended Complaint pursuant to Code § 523(a)(5) with respect to any award of child support is granted and any such debt is determined to be nondischargeable, as acknowledged by both parties; it is further

ORDERED that the relief sought in the Plaintiff's Amended Complaint pursuant to Code § 523(a)(15) is dismissed without prejudice provided that the Debtor seeks and is granted relief from the automatic stay to proceed with the State Court action for divorce within 60 days of the date of this Order; and it is finally

ORDERED that in the event that the State Court enters a Judgment of Divorce following relief from the automatic stay, the Plaintiff may file a Second Amended Complaint pursuant to Code § 523(a)(15) within 30 days of the issuance of the Judgment of Divorce in order to allow this Court to make a determination concerning the dischargeability of any award of equitable distribution.

Dated at Utica, New York

this 10th day of January 2007

/s/   Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge